# AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Nicholas J. Iannone, being sworn, state:

## Introduction and Agent Background

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am also an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2. I have been employed as a United States Postal Inspector since April 2023 and am currently assigned to the Boston Division Headquarters of the United States Postal Inspection Service ("USPIS"). Prior to my tenure with USPIS, I was a Special Agent with the United States Postal Service ("USPS"), Office of Inspector General. I worked in that capacity for two years, investigating a variety of cases including narcotics trafficking through the U.S. Mail. Before that, I served as a United States Postal Inspector in New York City for approximately two years. Furthermore, I was employed as a New Hampshire State Trooper for approximately five and a half years where I worked a variety of patrol and investigatory assignments. I was previously certified as a nationally accredited drug recognition expert and instructor.

3. During my employment with USPIS, I have participated in numerous investigations relating to the distribution of controlled substances, including fentanyl, methamphetamine, cocaine, marijuana, various prescription medications, and other substances in violation of the federal anti-drug laws, including Title 21, United States Code, Sections 846 and 841(a)(1). I have received training in the field of narcotics enforcement and investigations.

4. I am currently assigned to the USPIS sponsored Regional Interdiction Investigation Drug Enforcement Task Force (hereinafter "RIIDE-TF") which is charged with the responsibilities to investigate, arrest and dismantle drug trafficking networks and utilize intelligence to effectively target and seize dangerous drugs affecting the citizens of Massachusetts. The RIIDE-TF currently consists of Postal Inspectors, a Massachusetts State Trooper, a Boston Police Department Detective and two criminal analysts from the Massachusetts National Guard.

5. I am familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the trafficking of illegal drugs. I have been the Affiant on affidavits in support of arrest warrants, search warrants, and other applications. I have also participated in other electronic intercept investigations. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, and with the methods of payment for such drugs. I am familiar with the common appearance, packaging, and texture, of narcotics including fentanyl, heroin, oxycodone, and other illegal drugs. I have debriefed numerous defendants, informants and witnesses who had personal knowledge about narcotics trafficking activities, and the operation of narcotics trafficking organizations. Personally, I have participated in all aspects of narcotics trafficking investigations, including conducting surveillance, interviewing defendants and witnesses with personal knowledge about controlled substance trafficking, and acting in an undercover capacity.

6. Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, and use prepaid cellular telephones (where the subscriber of the phone is not required to provide

personal identifying information) in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

**Purpose of the Affidavit**

7. I am currently investigating Jack Saez ("SAEZ"), Christopher RIVERA RODRIGUEZ ("RIVERA RODRIGUEZ"), Duamel OCASIO ("OCASIO"), Jan Carlos MARTINEZ MENDEZ ("MARTINEZ MENDEZ"), Dayanara MENDEZ ("MENDEZ"), Justin GILCHREST ("GILCHREST"), David HERNANDEZ ("HERNANDEZ"), Ana MELENDEZ ("MELENDEZ"), Stephen BANDILLA III ("BANDILLA III"), Gerardo VILLEGAS RODRIGUEZ ("VILLEGAS RODRIGUEZ"), Joel MATOS ("MATOS"), Ryan FOLEY ("FOLEY"), and others (collectively, the "Target Subjects") for violations of 21 U.S.C. §§ 841(a)(1) (distribution of controlled substances) and 846 (conspiracy to distribute controlled substances) (the "Target Offenses").

8. I submit this affidavit in support of an application for a search warrant to search 148 Ballouville Road, Dayville, Connecticut 06241 (hereinafter, the "TARGET LOCATION") for evidence, fruits, and instrumentalities of the Target Offenses. The TARGET LOCATION is further described in Attachment A. The items to be seized are further described in Attachment B. Based on the facts set forth in this affidavit, there is probable cause to believe SAEZ, MENDEZ, and other Target Subjects are engaged in drug trafficking, and that evidence, fruits, and instrumentalities of the Target Offenses will be found in the TARGET LOCATION.

9. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents[1] and witnesses. This affidavit is intended to show that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**BACKGROUND**

10. On October 21, 2025, the Honorable Margaret R. Guzman, United States District Judge, District of Massachusetts, signed an Order (hereinafter, the "October 21 Order") authorizing the initial interception of wire and electronic communications of (860)-455-8302 (hereinafter, "Target Telephone 1") and (646) 662-4904 (hereinafter, "Target Telephone 2"), both used by SAEZ. District Judge Guzman signed Orders authorizing the continued interception of wire communications over Target Telephone 1 on November 20, 2025, December 22, 2025, and January 23, 2026 (hereinafter, the "November 20 Order," the "December 22 Order," and the "January 23 Order"), respectively. On March 3, 2026, the Honorable Myong J. Joun, United States District Judge, signed an order (hereinafter, the "March 3 Order") authorizing the renewed interception of wire communications of SAEZ over Target Telephone 1. Investigators have been monitoring and intercepting SAEZ's wire communications over Target Telephone 1 since October 22, 2025, with several small breaks between interception periods.

11. The investigation into the SAEZ Drug Trafficking Organization (hereinafter, "SAEZ DTO") began on October 26, 2024, when an individual residing in Southbridge, Massachusetts ("Individual 1") unexpectedly received a USPS package from Puerto Rico that was

[1] The term "agents" refer collectively to DEA Special Agents, Task Force Officers, Postal Inspectors, local detectives, local officers, and any other investigative team members.

addressed to Individual 1. Upon opening the package, Individual 1 discovered the package appeared to contain narcotics. Individual 1 turned the package over to the Southbridge Police, who submitted the suspected narcotics to the DEA. The DEA tested the substance in the package, and confirmed the substance was cocaine. Individual 1 reported to the police that after the delivery of the package, two subjects identified as HERNANDEZ and MELENDEZ contacted him repeatedly inquiring about the whereabouts of the package and accusing him of stealing from them.

12. Investigators reviewed USPS business records to identify additional parcels that may be connected to the package sent to Individual 1's residence. In November 2024, investigators began tracking packages suspected of containing narcotics that were shipped from Puerto Rico to various addresses in Worcester County, Massachusetts. Investigators looked for packages that had a combination of characteristics, which, when found in combination, have shown a high probability that the packages will contain drugs or proceeds of drug sales, including (1) mailed from or addressed to a known narcotic source city, (2) fictitious return and/or sender address or name; (3) handwritten address information; (4) absence of a business account number, indicating the sender paid cash; (5) addressed from an individual to another individual; and (6) heavily taped.

13. On February 24, 2025, investigators identified a suspected drug package bearing US Postal Package Tracking # 9505 5130 3667 5053 9377 41 inbound from Puerto Rico to 40 Pleasant Street, Webster, Massachusetts, which is the residence of HERNANDEZ and MELENDEZ. On February 25, 2025, investigators established surveillance at the residence in anticipation of the delivery of the package. At approximately 2:20 p.m., investigators observed MELENDEZ and an unknown male exit the residence and retrieve the package. Following the delivery of the package, investigators performed a review of USPS business records and

determined several IP addresses had tracked the package. The following IP addresses were used to query the status of the 40 Pleasant Street package:

73.253.10.52 (Comcast Cable)

2601:19e:4380:5d3 0:643c:1508:7dc1:dcc3 (Comcast Cable)

14. On February 27, 2025, investigators issued a subpoena to Comcast for information about the IP addresses. On March 6, 2025, Comcast identified the subscriber name of both IP addresses as Dayanara MENDEZ. The service address and billing address associated with MENDEZ's account was identified as the TARGET LOCATION. MENDEZ's phone number was identified as (774)-251-7671 (hereinafter, the "MENDEZ-7671 Phone"). Based on this information, investigators believe a device connected to the IP address of the TARGET LOCATION tracked the shipment of the February 25 Package.

15. On March 12, 2025, investigators conducted a site survey of the TARGET LOCATION and observed a black 2016 Ford Explorer, bearing Massachusetts registration 4ZFV22, a red 2016 Honda Accord, bearing Massachusetts registration 9XC238, and a silver 2020 Honda CR-V, bearing Connecticut registration BC38597. The Ford Explorer and Honda Accord were registered to MENDEZ, and the Honda CR-V was registered to Maribel Saez, who investigators believe to be SAEZ's mother. On March 14, 2025, investigators conducted an open-source data query for the TARGET LOCATION and learned that SAEZ also lives at the residence.

16. Investigators examined call data records for the MENDEZ-7671 Phone and identified Target Telephone 1 as the top contact. Investigators searched the Clear[2] database and

[2] Clear is an investigative platform that searches proprietary sources and public records to obtain information on individuals and businesses.

discovered that Target Telephone 1 was linked to SAEZ through publicly accessible historical phone database records. Investigators conducted an open-source query of Target Telephone 1 and discovered a WhatsApp account of a male wearing a hooded shirt and sunglasses and a Cash App account under the name "Nuni Saez" with username "jdmnuni." Investigators noted the facial hair of the male pictured in the WhatsApp account appeared to match the facial hair of SAEZ in his Massachusetts state driver's license photograph: The photographs are below, and I believe that they both depict the same person, SAEZ:




17. On April 9, 2025, investigators sent a subpoena to Verizon Wireless for information about Target Telephone 1. On April 10, 2025, Verizon identified the subscriber name of Target Telephone 1 as "Dayanara Mendez" with the TARGET LOCATION listed as the subscriber address. Target Telephone 1 has been active since April 13, 2023.

18. Over the course of the investigation, which has spanned over 12 months, investigators have observed on covert surveillance camera SAEZ and MENDEZ consistently return to the TARGET LOCATION at the end of each day. Furthermore, investigators have established through physical surveillance the daily patterns of life of SAEZ and MENDEZ, which confirms the TARGET LOCATION is their primary residence.

On April 1, 2025, MENDEZ Picked Up a Suspected Drug Package, Delivered it to SAEZ at the DTO's Stash Location at 13 Stoneland Road, and both SAEZ and MENDEZ Returned to the TARGET LOCATION.

19. On March 29, 2025, investigators identified four suspected drug packages sent from Puerto Rico to various addresses in Worcester County, Massachusetts. One of the packages was identified as follows: USPS Priority Mail (Tracking # 9505 5103 3668 5087 9536 86), mailed March 28, 2025, weighing 10 lbs., addressed to Santa Torres, 69 Outlook Drive, Apartment 14, Worcester, MA 01602, with sender information Luis Torres, Calle 5 D25 Mameyal, Dorado, Puerto Rico, 00646. Based on public records, the listed sender is fictitious, as no known individual named "Luis Torres" is associated with Calle 5 D25 Mameyal, Dorado, Puerto Rico, 00646. Based on my training and experience, the fact the package had a fictitious sender name, had handwritten sender and addressee information, was similar in size to previously intercepted drug packages associated with the DTO, had postage paid for in cash, and originated in Puerto Rico, I believe the 69 Outlook package contained cocaine.

20. On April 1, 2025, at approximately 12:15 p.m., investigators set up surveillance on 69 Outlook Drive in anticipation of the delivery of the suspected drug package. Investigators observed a USPS carrier deliver the package to the residence at approximately 12:38 p.m. At approximately 12:43 p.m., investigators observed MENDEZ arrive in her black 2016 Ford Explorer. MENDEZ left the area to run errands without interacting with anyone or touching the delivered package. At approximately 3:18 p.m., investigators observed MENDEZ return to 69 Outlook Drive and park in the rear lot of the residence. At approximately 4:02 p.m., investigators observed MENDZ carrying a large beige tote bag on her left shoulder that was filled with an object shaped similarly to the suspected drug package that was delivered earlier that day.



21. MENDEZ then drove her vehicle to one of the DTO's stash locations located at 13 Stoneland Road, Worcester, Massachusetts. Investigators observed MENDEZ carry the weighted tote bag toward the rear of 13 Stoneland Road. At approximately 4:18 p.m., investigators observed MENDEZ walk away from the 13 Stoneland Road property empty-handed:



22. Investigators observed the Dodge Ram truck that SAEZ was driving earlier that day also parked at 13 Stoneland Road. Based on that observation, investigators believe SAEZ was at 13 Stoneland Road at the time MENDEZ delivered the suspected drug package. Later that night, the Ford Explorer and Dodge Ram truck were both parked at the TARGET LOCATION. Based on those movements and observations, investigators believe that after MENDEZ turned the suspected cocaine package over to SAEZ at 13 Stoneland Street, both MENDEZ and SAEZ returned to the TARGET LOCATION.

On May 20, 2025, SAEZ Retrieved a Suspected Drug Package from GILCHREST and Drove to the TARGET LOCATION

23. On May 17 and May 18, 2025, investigators learned of three suspected drug packages inbound from Puerto Rico to addresses in Worcester County used by the SAEZ DTO. One of the packages was identified as follows: USPS Priority Mail, (Tracking # 9505 5103 3667 5137 9669 88), mailed on May 17, 2025, weighing 10.5 lbs., addressed to Jay Perry, 3 Richard Avenue, Webster, MA 01570, with sender information Luis G. Perry, Calle 13B-162 Urbel Mameya, Dorado, Puerto Rico 00646. Based on public records, the listed recipient is fictitious, as no known individual named "Jay Perry" is associated with 3 Richard Avenue, Webster, Massachusetts. The name "Jay Perry" was also used on a suspected drug package delivered to 3 Richard Avenue on April 1, 2025. Based on training and experience, the fact the package had a fictitious recipient name, had handwritten sender and addressee information, had postage paid for in cash, was similar in size to other intercepted drug packages, and originated in Puerto Rico, I believe the 3 Richard Avenue package contained cocaine.

24. On May 20, 2025, investigators also established surveillance on 3 Richard Avenue in anticipation of the delivery of the suspected drug package. At approximately 12:42 p.m.,

investigators, via drone video, observed a USPS carrier deliver the package to 3 Richard Avenue. Investigators observed GILCHREST exit 3 Richard Avenue, retrieve the package, and bring it inside the residence. At approximately 2:52 p.m., investigators observed SAEZ arrive at 32 Ash Street, a residence a short distance from 3 Richard Avenue. At approximately 3:14 p.m., GILCHREST carried the suspected drug package from 3 Richard Avenue to 32 Ash Street. Investigators observed GILCHREST place the package in front of SAEZ, who carried the package into 32 Ash Street. At approximately 4:23 p.m., investigators observed SAEZ exit 32 Ash Street carrying a gray, square-shaped shopping bag, which was similarly shaped to the suspected drug package. Investigators observed SAEZ place the bag into the trunk of his vehicle and maintained physical surveillance of SAEZ as he traveled to the TARGET LOCATION via Interstate 395 South. At approximately 4:38 p.m., investigators observed SAEZ arrive at the TARGET LOCATION via covert surveillance camera. Investigators observed SAEZ park at the rear of his driveway and carry the square-shaped shopping bag into an enclosed car trailer via a side door. Based on experience and training, investigators believe that SAEZ picked up a narcotics package sent from Puerto Rico and stored it in the (car carrier) of the TARGET LOCATION.



<u>On October 28, 2025, SAEZ Told RIVERA RODRIGUEZ He Stores Narcotics in the Garage of 13 Stoneland Street</u>

25. On October 28, 2025, at approximately 4:42 p.m., SAEZ, using Target Telephone 1, received an incoming call from RIVERA RODRIGUEZ at (787) 948-5209 (hereinafter, the "RIVERA RODRIGUEZ-5209 Phone"). During the call, SAEZ told RIVERA RODRIGUEZ he had narcotics "at the garage." Below is an excerpt of the conversation:

RIVERA: Hello. Listen, did you go down to Worcester?
SAEZ: Yes, uh-hum.
RIVERA: Uh, did you open anything up? Do you have some of that, from the 14?
SAEZ: I have some at the garage, I think. I'm going to check. I have not opened any of them, but…I have some there.
RIVERA: But is it in powder form?
SAEZ: No, I was able to get a little bit.
RIVERA: Yeah, because….the one you gave me; the last one was bad.
SAEZ: the last one?
RIVERA: yeah, the one you gave me was in powder form; it was really powdery.
SAEZ: Nah, that is all in the head. That is all in the head but…
RIVERA: He said it was bad
SAEZ: I gave it to you whole; all solid

26. Based on my training and experience and the context of the conversation, I believe when RIVERA RODRIGUEZ asked if SAEZ had "some of that," he was referring to cocaine. I further believe when SAEZ said, "I have some at the garage, I think," he was referring to the DTO's stash location behind 13 Stoneland Road. Based on physical surveillance, investigators know there is a detached garage behind 13 Stoneland Road. As discussed *infra*, investigators believe SAEZ has a key that he uses to access this garage. Based on my training and experience, I know that drug traffickers often keep the keys to their stash locations in their residences. Thus, I believe that when he is not using the key to access the 13 Stoneland Road garage, SAEZ keeps the key to the stash location inside the TARGET LOCATION.

<u>On November 12, 2025, SAEZ Left the TARGET LOCATION to Distribute Narcotics to BANDILLA III</u>

27. On November 12, 2025, at approximately 9:29 a.m., SAEZ, using Target Telephone 1, made an outgoing call to BANDILLA III at (508) 963-3235 (hereinafter, the "BANDILLA III-3235 Phone") (Session 335). During the call, BANDILLA III requested "50" from SAEZ. Below is an excerpt of the conversation:

| | |
|---|---|
| BANDILLA III: | But yeah, I need 50. |
| SAEZ: | I got you. |
| BANDILLA III: | As soon as we can. The guy's on my ass about you. |
| SAEZ: | I got you. I got to take a dump right now and stuff. I got an appointment at 11:00. |
| BANDILLA III: | Yeah, I'll be uh…either at my house in East Brookfield or fucking uh…in Charlton. |
| SAEZ: | Alright, sounds good. |
| *Later in the conversation* | |
| BANDILLA III: | Alright, let me know. Call me. |
| SAEZ: | I got you. |
| BANDILLA III: | Cause I'll be at either place. I'm not going anywhere else. |
| SAEZ: | I'll call you when I'm on the way |
| BANDILLA III: | Alright. |

28. Based on my training and experience, I believe when BANDILLA III said, "I need 50," he was requesting 50 grams of narcotics from SAEZ. Based on my investigation, I know that BANDILLA III is one of SAEZ's retail drug distributors. I further believe that the purpose of the call was to arrange a drug transaction.

29. Later that day, at approximately 2:50 p.m., investigators observed SAEZ retrieve a bag from his vehicle and walk towards the entrance of the TARGET LOCATION. Shortly thereafter, SAEZ entered his vehicle without the bag, prior to leaving the TARGET LOCATION at approximately 2:53 p.m. Based on experience and training and the intercepted calls described above and below, investigators believe SAEZ took suspected narcotics from his vehicle into the TARGET LOCATION.



30. Later that day, at approximately 6:12 p.m., SAEZ, using Target Telephone 1, received an incoming call from BANDILLA III on the BANDILLA III-3235 Phone (Session 347). During the call, BANDILLA III and SAEZ further discussed the drug transaction. Below is an excerpt of the conversation:

SAEZ: I'm on my way to you right now.
BANDILLA III You're fucking stupid. Your girl's supposed to come over like five hours ago.
SAEZ: Nah, I'm on the way to you.
BANDILLA III: Let me know where at.
SAEZ: Where you at? Yeah, Charlton or the new house?
BANDILLA III: No, I'm in Worcester.
SAEZ: Oh, where you at then?
BANDILLA III: I'm going to Applebee's on Park Ave.
SAEZ: Alright. Just leave the car open. I'll drop it inside the car if you want.
BANDILLA III: Alright

31. Based on my training and experience, I believe when SAEZ said, "I'll drop it inside the car if you want," he was referring to BANDILLA III's drug order. I further believe that during this call, SAEZ set up a "dead drop," which is a method of drug distribution that minimizes risk of detection and arrest by law enforcement by eliminating in person contact between the seller and the buyer. Based on the covert surveillance video at the TARGET LOCATION from earlier that

day, I believe SAEZ traveled from the TARGET LOCATION with narcotics to the Applebee's restaurant, located on 632 Park Ave, Worcester, MA, to drop off the narcotics to BANDILLA III.

<u>On December 3, 2025, SAEZ Left the TARGET LOCATION to Distribute Cocaine to OCASIO</u>

32. On December 3, 2025, at approximately 4:24 p.m., SAEZ, using Target Telephone 1, received an incoming call from OCASIO on (603) 556-2153 (hereinafter, the "OCASIO-2153 Phone") (Session 636). During the conversation, SAEZ told OCASIO he recently received cocaine. Below is an excerpt of the conversation:

| | |
|---|---|
| OCASIO: | what's been dropping, nothing? |
| SAEZ: | Shit, I just got good today. |
| OCASIO: | the what? The white girl? |
| SAEZ: | um-hum. And for the other I should be good tonight |
| OCASIO: | Let me know nigga, 'cause I'm fucking…bro, I'm like, I'm like fucking just….basically keeping my people nigga |

33. Based on my training and experience, I believe that when SAEZ told OCASIO he "just got good today," he was telling OCASIO that he finally has drugs available. I further believe that when OCASIO asked if SAEZ has "the white girl," he was asking SAEZ if he had cocaine.

34. Later that afternoon, at approximately 5:51 p.m., investigators observed SAEZ exit the front door of the TARGET LOCATION carrying a bag. SAEZ then entered his black Ford Explorer, bearing Massachusetts registration 4ZFV22 and departed the area. Based on experience and training and the intercepted calls described above and below, investigators believe SAEZ took suspected narcotics from the TARGET LOCATION to his vehicle.



35. That evening, at approximately 6:04 p.m., SAEZ, using Target Telephone 1, received an incoming call from OCASIO on the OCASIO-2153 Phone (Session 648). During the conversation, OCASIO asked SAEZ for an ounce of cocaine. Below is an excerpt of the conversation:

OCASIO: Yeah, I need that "hot body" you heard
SAEZ: Yeah. How much you need?
OCASIO: Huh?
SAEZ: How much you need?
OCASIO: Like a…let me see…what's the…what's the number on 28?
SAEZ: 560
OCASIO: Let me…let me get uh…yeah, let me get that.
SAEZ: Alright, I got you. I'm just gonna show up to this nigga's house, nigga
OCASIO: Yeah, but I need that. Make sure, alright?
SAEZ: Yeah, nah. I'm calling him, the nigga's just…he must be sleeping or something 'cause, that arrived. You get me? That arrived this morning.
OCASIO: uh-huh
SAEZ: He was waiting for me, but I told him nigga, once the food was done, I'm heading out of here. So…he can't make me come out here in vain, you get me?
OCASIO: you want me to bang on his door?
SAEZ: Yeah, but you know where he lives?
OCASIO: Who?

SAEZ: Chris

36. Based on my training and experience, I believe that when OCASIO told SAEZ he needs "that hot body," he was referring to cocaine. I further believe that when OCASIO asked, "what's the number on 28," he was asking SAEZ what the price was for 28 grams (1 ounce) of cocaine. Based on the context of the conversation, I further believe that SAEZ was going to pick up drugs from RIVERA RODRIGUEZ, whose first name is "Chris," for distribution to OCASIO. Based on the covert surveillance video from the TARGET LOCATION earlier that day, I believe SAEZ traveled from the TARGET LOCATION to retrieve cocaine from RIVERA RODRIGUEZ to distribute to OCASIO.

37. On December 5, 2025, SAEZ, using Target Telephone 2, made an outgoing call to FOLEY on the FOLEY-2890 Phone (Session 670). During the call, SAEZ and FOLEY discussed a narcotics transaction. Below is an excerpt of the conversation:

FOLEY: What up?
SAEZ: Yo, bro, how many do you want?
FOLEY: 40.
SAEZ: 40 of them?
FOLEY: Yup.
SAEZ: Alright. Sounds good. I'll be there soon.
FOLEY: Alright. Alright, cool.

38. Based on my training and experience, I believe when FOLEY requested "40," he was requesting a quantity of 40 pills from SAEZ. I further believe these pills are diverted pharmaceuticals. Based on the context of the conversation, I believe when SAEZ said, "I'll be there soon," he was telling FOLEY he was going to meet him to deliver the pills.

<u>On December 16, 2025, SAEZ Used Target Telephone 2 to Discuss Drug Trafficking with MATOS</u>

39. On December 16, 2025, SAEZ, using Target Telephone 2, made an outgoing call to MATOS at (774) 351-5552 (hereinafter, the "MATOS-5552 Phone") (Session 794). During the call, SAEZ and MATOS discussed drug trafficking. Below is an excerpt of the call:

| | |
|---|---|
| SAEZ: | Fucker really, really, listen, when I get back I want to sit down with you, I want to sit down with Gordo, with the whole group, fucker. And we all are going to reach an agreement. And fucker, this shit of all these fuckers arriving there from PR is not going to work, really. |
| SAEZ: | [unintelligible] Fucker, but we have to get to work, because I want things to change now for real. This shit about these fuckers coming down from Puerto Rico to over there? We have to cut that in order to bring the numbers up for real. |
| MATOS: | Dude, that's what I... We used to... I used to sell it at 19, and grab it at 16. Because remember that nobody wants . . . |
| SAEZ: | We have to cut that, these fuckers are messing up the move. |
| MATOS: | Remember, nobody wants their work because their work is not even good for sniffing. |
| SAEZ: | Fucker, they don't take it. |
| MATOS: | When they sent me over there? Buddy, if you saw that you would say: "Fucker, this is chalk [ph], this is..." But since that's a quick exchange . . . I told him so. Ask Gerard. I told him: "Dude, I can get better numbers than this, but what happens is that there is nothing." Because you know the only one I had bought from is Pearl White, Gordo's brother and he doesn't get along with them. |
| SAEZ: | Uh-huh. |
| MATOS: | If he tells me that I hang out with the guy who knocked his brother's teeth, I'll say yes to him. |
| SAEZ: | Fucker, they were trying to tell me that Gordo was even buying from Janpy and everything. |
| MATOS: | No, that's a lie. You know that they talk, but nothing about work. What you have always seen. Janpy could have some, but I would call Gordo, because you've always seen that I dealt with Gordo, with Pearl White. |
| SAEZ: | Listen, ask Gordo, I even got Gordo a better number going against Janpy so that Gordo could sell more work than him. |

40. Based on my investigation, as well as my training and experience, I believe when SAEZ said, "this shit of all these fuckers arriving there from PR is not going to work," he was

expressing frustration to MATOS regarding the number of people coming to Massachusetts from Puerto Rico. I further believe when SAEZ said, "we have to cut that in order to bring the numbers up for real," he was referring to minimizing the number of people coming to Massachusetts from Puerto Rico who are engaging in drug trafficking and cutting into his DTO's profits. Furthermore, when MATOS said, "I used to sell it at 19, and grab it at 16," he was telling SAEZ he used to make a $3,000 profit by buying kilograms of cocaine for $16,000 and selling them for $19,000. When SAEZ said, "we have to cut that, these fuckers are messing up the move," he was referring to other drug traffickers from Puerto Rico who are driving down the cost (and profits) of cocaine trafficking in Massachusetts. When MATOS said, "nobody wants their work because their work is not even good for sniffing," he was referring to other DTO's kilograms of cocaine (i.e., their "work") which has a low quality that is not even suitable for snorting (i.e. "sniffing").

On January 29, 2026, MENDEZ Picked Up a Suspected Drug Package and Communicated with SAEZ About Countersurveillance

41. On January 25, 2025, investigators identified a suspected drug package, bearing tracking number 9505 5114 5581 6024 9709 97 inbound from Puerto Rico and addressed to "Felix Mendez, 6 Wachusett St, Apt #7B, Worcester, MA 01609." On January 29, 2026, investigators set up surveillance on 6 Wachusett Street in anticipation of the delivery of the suspected drug package. The package weighed approximately 6 pounds and 5 ounces, which indicates the package likely contained at least one kilogram of narcotics. Based on the package characteristics, which were similar to previously intercepted drug packages (i.e., fictitious sender information, handwritten address information, addressed from an individual to an individual, postage paid for in cash), and the fact the package was sent to 6 Wachusett Street, a known drop address of the DTO, investigators believe the package contained narcotics. Investigators observed a red Acura

Integra bearing Massachusetts registration 2BHW76 arrive at the front entrance of 6 Wachusett Street. Investigators identified the driver of the vehicle as MENDEZ. Investigators observed MENDEZ's front-seat passenger retrieve the suspected drug package and bring it into MENDEZ's vehicle.

42. On January 29, 2026, at approximately 1:57 p.m., SAEZ, using Target Telephone 1, received an incoming call from SAEZ SR at (774) 777-0507 (hereinafter, the "SAEZ SR-0507 Phone") (Session 2034). During the call, SAEZ told SAEZ SR that his girlfriend, MENDEZ, noticed a Subaru following her. The Subaru they discussed is the vehicle investigators used to conduct surveillance on MENDEZ. Below is an excerpt of the conversation:

SAEZ: She caught the car following her 4 times already, she loses him and then he catches up to her again. I don't really know . . . because she is not even driving her own car today, she is driving a loaner from the dealer. Her SUV is having issues and now they're saying it may have transmission problems, but they just want to be sure before they rule it out.
SAEZ SR: Mm . . . what kind of car is she driving then?
SAEZ: Yes, she is in a new Acura Integra, wine color. It's actually red.
SAEZ SR: Yes, I'm across the street from the dealer, inside another vehicle. Just in case I see the Subaru. If she goes parks, and I see the Subaru I will follow it and see who the fuck it is.
SAEZ: I told her to check and see if Jaylee can watch the baby so she can go to an appointment.
SAEZ SR: Yes.
SAEZ: I told her to go see if she can switch this car out, to run and lose this car and to go switch cars.

43. Later in the same conversation, SAEZ used Target Telephone 1 to discuss with SAEZ SR whether a law enforcement individual named Michael could run the plates of the Subaru MENDEZ had noticed. Below is an excerpt of the conversation:

SAEZ: Michael is police, right?
SAEZ SR: Yes.
SAEZ: That's Jackie's boyfriend.

SAEZ SR: Yes.
SAEZ: Can he run plates or not? I have the car plate.
SAEZ SR: Yes he can run it.
SAEZ: Yes?
SAEZ SR: Yes.

44. Later that afternoon, at approximately 2:02 p.m., SAEZ, using Target Telephone 1, made an outgoing call to SAEZ SR on the SAEZ SR-0507 Phone (Session 2037). During the call, SAEZ told SAEZ SR that SAEZ texted him the Subaru's plate information and that MENDEZ switched cars. Below is an excerpt of the conversation:

SAEZ: Um….it's 9…she is actually there at the light. But she just lost him again.
SAEZ SR: It's . . .
SAEZ: It's number 9 . . . letter T . . .
SAEZ SR: Wait.
SAEZ: I can text it to you if you want?
SAEZ SR: Yes, just text it so I can forward it to the phone, and since I'm talking to you I don't know how to switch it.
SAEZ: Alright.
SAEZ SR: Let me send it to you via messenger. Is she still driving on Massasoit?
SAEZ: Yes, she was almost at the light. She is going to be driving a new Integra. Acura Integra.
SAEZ SR: Yes, I see her now. She just took off over there. Yes, she is heading towards the garage.
SAEZ: Yes.
SAEZ SR: Where does she need to go to switch this car?

*Later in the conversation*

SAEZ SR: No, no. When she comes by, I will get behind her and follow her.
SAEZ: Head to your house.
SAEZ SR: Alright, I will follow her all the way to the highway and if I don't see anyone following her I will turn back around.
SAEZ: Alright. Thank you.

45. Based on my training and experience, I believe that MENDEZ spotted surveillance after picking up a suspected drug package. I further believe that MENDEZ told SAEZ the license plate number of an investigator's vehicle that was conducting surveillance on her, and that SAEZ

relayed this license plate number to his father, SAEZ SR. I know from my investigation that during this call, SAEZ was in Puerto Rico and MENDEZ was in Worcester County, Massachusetts. Based on my training and experience, I believe that MENDEZ used the MENDEZ-7671 Phone to communicate with SAEZ through either Facetime or an encrypted messaging application on her the MENDEZ-7671 Phone.

On February 15, 2026, SAEZ Discussed Missing Drug Packages with RIVERA RODRIGUEZ that had been Seized by Investigators

46. On February 15, 2026, at approximately 4:48 p.m., SAEZ, using Target Telephone 1, made an outgoing call to RIVERA RODRIGUEZ on the RIVERA RODRIGUEZ-5209 Phone (Session 2364). During the call, SAEZ and RIVERA RODRIGUEZ discussed their missing drug packages. Below is an excerpt of the conversation:

RIVERA: And it looks like he doesn't know that the boxes fell through, you heard?

SAEZ: No?

RIVERA: I don't think so because he told me that he only owes me 3,000 pesos which he hasn't paid me but that's fine. For me not to get upset because it was taking a long time. That's what he said.

*Later in the conversation*

SAEZ: Exactly. That's what I told him, "it's sad that on the first play, you lost both, you understand? But that's a part of it." I told him, "And that's legal, fucker. It's legal, fucker. There's the receipts with the time, you understand?" He told me that but I never told him, fucker, I don't know. I told him, "I don't know, faggot." But I know that he's not going to do anything evil to you. I'm 100% sure. He told me, "No, forget about that. I just want to work." And I told him, "fucker, talk to your cousin so she can lend you a couple of pesos. You can work, fucker, and we can make it back quickly."

RIVERA: Definitely

SAEZ: We can make that back quickly.

RIVERA: Of course, man

47. Based on my training and experience, I believe when RIVERA RODRIGUEZ said, "it looks like he doesn't know the boxes fell through," he was referring to VILLEGAS

RODRIGUEZ, who is a DTO member who arranged for a drug package to be mailed on February 4, 2026. When SAEZ said, "it's sad that on the first play, you lost both," he was referring to the shipment of drug packages (i.e. a "play") that resulted in the loss of two kilograms of narcotics. When RIVERA RODRIGUEZ said, "what he needs is discipline and look for where to send the boxes," he was telling SAEZ that VILLEGAS RODRIGUEZ needs to find other drop addresses to send drug packages.

48. I know from my investigation that VILLEGAS RODRIGUEZ arranged for a drug package to be mailed from Puerto Rico to Worcester County, Massachusetts on February 4, 2026. On February 4, 2026, investigators detained two drug packages mailed from Puerto Rico that were destined to 211 Charlestown Meadows Drive, Westborough, MA, and 40 Pleasant Street, APT #2L, Webster, MA," which are both drop addresses used by the SAEZ DTO. Investigators obtained federal search warrants for the packages and seized approximately one kilogram of suspected cocaine in each package.[3] *See* 26-106 (M) and 26-6178-MPK. Based on the context of the conversation, I believe that SAEZ and VILLEGAS RODRIGUEZ were discussing one of these missing drug packages, which unbeknownst to them, had been seized by investigators. Below is a photograph of the kilogram of suspected cocaine that was seized from the 40 Pleasant Street package:

[3] The substances field tested positive for cocaine. Drug certificates from the DEA Laboratory are pending.




On March 12, 2026, SAEZ Arranged a Drug Transaction Between OCASIO and FOLEY

49. On March 12, 2026, at approximately 12:26 p.m., SAEZ, using Target Telephone 1, made an outgoing call to OCASIO at (508)-239-3948 (hereinafter, the "OCASIO-3948 Phone")[4] (Session 2611). During the call, SAEZ asked OCASIO if a drug customer named "Ryan" reached out to him. Below is an excerpt of the conversation:

OCASIO: Been waiting on you
SAEZ: Um…I'm going to go down there in a few. Did Ryan call you?
OCASIO: He called me yesterday but I didn't have any of those things.
SAEZ: You should have told me, I would have had Daya pass you some.

50. Based on my training and experience, I believe when SAEZ asked OCASIO if "Ryan" called him, he was referring to FOLEY, whose first name is Ryan. I further believe when OCASIO said, "he called me yesterday but I didn't have any of those things," he was referring to

[4] OCASIO started using this new telephone number after being released from jail.

FOLEY calling him and asking for fentanyl pills. When SAEZ said, "you should have told me, I would have had Daya pass you some," I believe he was referring to his girlfriend, MENDEZ, whose first name is Dayanara. Based on my training and experience, I believe MENDEZ is actively involved in distributing narcotics for the DTO.

51. Approximately 10 minutes later, at 12:36 p.m., SAEZ, using Target Telephone 1, received an incoming call from OCASIO on the OCASIO-3948 Phone (Session 2613). During the call, SAEZ and OCASIO discussed narcotics trafficking and contacting old customers. Below is an excerpt from the conversation:

| | |
|---|---|
| OCASIO: | Did you see that when you opened the box? |
| SAEZ: | Nah. What I saw was…well, I think you have blue ones in there as well as pills. |
| OCASIO: | The cookie. |
| SAEZ: | Uh-huh….and I took the cookie |
| OCASIO: | Did you see like a towel, like uh… |
| SAEZ: | Oh, I've seen the towel, yeah. I didn't check it, though. I didn't see anymore, I just opened it just to grab the clicker cause I remember you telling me that, the shit I made for you was there. |
| *Later in the conversation* | |
| SAEZ: | Yeah, I got you. Dude, don't forget about Ryan. He's been crying for you. |
| OCASIO: | Oh yeah? I'm going to call him right now. |
| SAEZ: | Don't tell him I told you |
| OCASIO: | Of course not. |
| SAEZ: | He was like, "hey have you called Chino, man? I've been blowing him up and he don't answer me," this and that…I was like, "I've seen him mad late, I'll call him, so let me know if he didn't contact you yet, so I'll call him," and then he was like, "oh yeah." He called me and I told him to wait till tomorrow. |

52. Based on my training and experience, I believe when OCASIO asked SAEZ about opening "the box," he was referring to his safe. I further believe when SAEZ said, "you have blue ones in there as well as pills," he was referring to blue fentanyl pills and other prescription opioid pills. When SAEZ told OCASIO not to "forget about Ryan," he was referring to FOLEY, who is a drug customer of OCASIO's.

53. At approximately 4:43 p.m., SAEZ, using Target Telephone 1, made an outgoing call to OCASIO on the OCASIO-3948 Phone. During the call, SAEZ agreed to bring OCASIO narcotics to sell to FOLEY. Below is an excerpt of the conversation:

| | |
|---|---|
| OCASIO: | That's fine, that's fine, that's fine. There is no rush. Did you bring Ryan's? |
| SAEZ: | Yeah, I got Ryan shit on me. |
| OCASIO: | Alright, there is no rush, when he is done. |
| SAEZ: | Alright, so I'll give you Ryan's when I give you the other stuff, right? |
| OCASIO: | Yeah. Yeah. |
| SAEZ: | Alright, bet. |
| OCASIO: | Unless, if he calls me before then I'll call you. |
| SAEZ: | I'm gonna be in Webster, that's the only thing, Um…so I can give it to you now though, it don't matter. |
| OCASIO: | That's fine, I'm home. |
| SAEZ: | Alright, I'll see you there. |

54. Based on my training and experience, I believe when OCASIO asked, "did you bring Ryan's," he was asking if SAEZ brought the narcotics for FOLEY. I further believe when SAEZ said, "I can give it to you now," he was offering to bring the narcotics to OCASIO's residence at 328 Greenwood Street, Worcester, MA. On March 12, 2026, investigators conducted physical surveillance and observed SAEZ drive to OCASIO's residence at 328 Greenwood Street, Worcester, MA. At approximately 6:30 p.m., investigators observed FOLEY arrive at 328 Greenwood Street and enter OCASIO's apartment building. Investigators seized 15 suspected fentanyl pills from FOLEY, which weighed approximately 32 grams.[5] At approximately 7:58 p.m., investigators observed SAEZ return to the TARGET LOCATION via covert surveillance camera. Based on my training and experience, I believe SAEZ brought narcotics to OCASIO to

[5] Investigators sent the pills to the DEA Lab and the results are pending.

sell to FOLEY, and that afterwards, SAEZ drug trafficking proceeds back to the TARGET LOCATION.





On March 13, 2026, SAEZ Delivered Narcotics to BANDILLA III and then Returned to the TARGET LOCATION

55. March 13, 2026, at approximately 1:44 p.m., SAEZ, using Target Telephone 1, received an incoming call from BANDILLA III on the BANDILLA III-3235 Phone (Session

2630). During the call, SAEZ arranged a drug delivery with BANDILLA III. Below is an excerpt of the conversation:

| | |
|---|---|
| SAEZ: | Yo, faggot! |
| BANDILLA III: | You left me hanging again! |
| SAEZ: | No |
| BANDILLA III: | Today is fucking Friday! |
| SAEZ: | No, I'm out here |
| BANDILLA III: | Here, where? |
| SAEZ: | Where do you want me to go? Send me the addy. I'm in Auburn. |
| BANDILLA III: | 17 Treadwell. |
| SAEZ: | Text it to me. I'm getting a haircut right now in Auburn. |
| BANDILLA III: | Oh, my God! Bye. |

56. At approximately 4:51 p.m., SAEZ, using Target Telephone 1, received an incoming call to BANDILLA III on the BANDILLA III-3235 Phone (Session 2639). During the call, SAEZ told BANDILLA III he arrived at his residence. Below is an excerpt of the conversation:

| | |
|---|---|
| SAEZ: | You're home? |
| BANDILLA III: | Yeah, motherfucker. |
| SAEZ: | Open the door. |
| BANDILLA III: | I already see you. You're still in your fucking car. |
| SAEZ: | You don't answer your fucking phone, man. I'm not gonna go inside. |
| BANDILLA III: | Why not? |
| SAEZ: | I don't know. |
| BANDILLA III: | Stop being chicken shit. |

57. I know from my training and experience that BANDILLA III is one of SAEZ's retail drug distributors. During numerous previously intercepted wire communications over Target Telephone 1, BANDILLA III requested "50" from SAEZ, which I believe refers to 50 grams of narcotics. Based on my training and experience, I believe the purpose of these calls was to arrange for SAEZ to drop off narcotics to BANDILLA III at his residence, located at 109 Dunnbrook Road,

East Brookfield, MA. Based on my training and experience, I believe SAEZ drove to BANDILLA III's residence and delivered narcotics to him.

58. At approximately 8:55 p.m., investigators executed a state search warrant at 109 Dunnbrook Road. During the search, investigators found $36,000 in U.S. currency and suspected narcotics including (i) 4 knotted plastic bags containing white powder, suspected to be cocaine, weighing in total approximately 13 grams; (ii) an orange plastic bottle containing 70 white round pills (with markings "712"), suspected to be Oxycodone, weighing approximately 85 grams; (iii) 84 buprenorphine/naloxone strips, weighing approximately 117 grams; (iv) a knotted plastic bag containing white powder, suspected to be cocaine, weighing approximately 88 grams; (v) 5 white oblong pills (with markings "IP 109"), suspected to be Hydrocodone, weighing approximately 59 grams; (vi) 31 white round pills (with markings "30 RP"), suspected to be Oxycodone, weighing approximately 52 grams; and (vii) two plastic bottles containing white powder, believed to be used as a cutting agent, weighing approximately 349 grams.

59. Investigators also found numerous firearms, including (i) a Marlin .22 bolt action rifle (26EAT-26-PR), serial #97694509; (ii) a Rohm .22 revolver with white hand guards (26EAT 25-PR), serial #769001; (iii) a Mauser 7.65 pistol with wood grips and one magazine (26EAT- 24-PR), serial #351195; (iv) a Cobra pistol with black grips, one magazine (26EAT-23-PR), serial #FS094397; (v) a Polymer 80 9mm pistol and two magazines (26EAT-22-PR), without a serial number. They also found firearm accessories and ammunition.

60. BANDILLA III was arrested on state firearms and narcotics charges in the Western Worcester District Court.

61. At approximately 11:34 p.m., via covert surveillance video, investigators observed SAEZ return to the TARGET LOCATION. Based on my training and experience, I believe SAEZ

received money from BANDILLA III in exchange for a quantity of narcotics. I further believe that after the transaction, SAEZ returned to the TARGET LOCATION with drug trafficking proceeds.





On March 14, 2026, the Day After BANDILLA III Got Arrested, SAEZ told Subject He Was Afraid He Would Get Raided

62. On March 14, 2026, SAEZ, using Target Telephone 2, received an incoming call from an individual known to the government ("Subject") (Session 2079). During the call, SAEZ and Subject discussed the arrest of BANDILLA and his suspicion that law enforcement would raid his properties. Specifically, during the call, SAEZ said, "I think they're going to raid me and everything." He then added, "I'm going to delete my Facebook and everything right now." Based on my training and experience, I believe this call is evidence of SAEZ's consciousness of guilt and the existence of the items described in Attachment B in the TARGET LOCATION.

On April 1, 2026, and April 2, 2026, Ping Data Shows Target Telephone 1 was in the TARGET LOCATION Between the Hours of 12:00 a.m. and 5:00 a.m.

63. Investigators reviewed ping data pertaining to Target Telephone 1. Prior to BANDILLA III's arrest on March 13, 2026, Target Telephone 1 was pinging within a few meters of the TARGET LOCATION consistently during nighttime hours. Shortly after BANDILLA III's arrest on March 13, 2026, SAEZ greatly decreased his usage of both Target Telephone 1 and Target Telephone 2 and began turning his phones off upon re-entering the District of Connecticut. However, on April 1, 2026, Target Telephone 1 began pinging again at the Target Location again.

64. Specifically, on April 1, 2026, investigators intercepted SAEZ over Target Telephone 2 acknowledging to an unidentified female that that he had not been using his phones recently, but that he had recently began using his phones again (Session 2319). During the conversation, the unidentified female asked, "are you good," to which SAEZ responded, "For now I am, my phones were off. I've turned them on for now, today is the 2nd day I have them on." Investigators reviewed the ping data from Target Telephone 1 between the hours of 12 a.m. and 5:00 a.m. on April 1, 2026, and April 2, 2026, and confirmed Target Telephone 1 was pinging at

the Target Location. Based on my training and experience, I believe SAEZ began using Target Telephone 1 and Target Telephone 2 again, and that there is a fair probability both facilities will be found in the TARGET LOCATION.

65. There is probable cause to search the TARGET LOCATION for evidence, fruits, and instrumentalities of the Target Offenses described in Attachment B. I know from my investigation that SAEZ is a drug trafficker who coordinates the shipment of packages containing kilograms of cocaine from Puerto Rico to Massachusetts. Based on interceptions over Target Telephone 1, I know that SAEZ has retail drug distributors who distribute narcotics for him in Worcester County, Massachusetts. Additionally, I know from my investigation that MENDEZ has retrieved drug packages for SAEZ at various drop addresses, transported the drug packages to the DTO's stash location, and distributed narcotics to retail drug distributors on SAEZ's behalf. As discussed *supra*, I know that SAEZ and MENDEZ live together at the TARGET LOCATION, and have lived there since the beginning of my investigation in February 2025. Furthermore, I know from my investigation that on numerous occasions, SAEZ has returned to the TARGET LOCATION after delivering narcotics to his retail drug distributors and accessing the DTO's stash location at 13 Stoneland Road, and that he uses Target Telephone 1 and Target Telephone 2 for drug trafficking. I also know that MENDEZ uses the MENDEZ-7671 Phone to communicate with SAEZ about picking up drug packages and conducting countersurveillance. Furthermore, as discussed *supra*, I know that two IP addresses with MENDEZ listed as the subscriber tracked a drug package that was destined to 40 Pleasant Street. I also believe that SAEZ and MENDEZ will be located at the TARGET LOCATION, since it is their main residence. Therefore, I believe it is likely that SAEZ and MENDEZ store the cellular telephones and electronic devices further described in Attachment B at the TARGET LOCATION.

<u>Drug Traffickers Use of Residences and Cell Phones</u>

66. Based upon my training and experience, I am aware that drug traffickers regularly use cellular phones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators. In my training and experience, I am also aware that drug traffickers are often aware of law enforcement's use of electronic surveillance and thus frequently change their cell phone numbers and/or use multiple cell phones at the same time, as well as prepaid cellular phones, in an effort to thwart law enforcement's use of electronic surveillance. Because cell phones are often a principal means of communication, drug traffickers typically keep the phones in close proximity or in their residences. Additionally, in my experience, many drug traffickers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences. As a result, it is common to recover not only paper records pertaining to the use of a cell phone by drug traffickers, such as bills, call detail records, statements, and other documents, but also the cell phones themselves from drug traffickers' residences.

67. Based on my training and experience executing search warrants at the residences of drug and firearm traffickers, in a substantial number of residential searches executed in connection with similar investigations, investigators have recovered:

a. Cellular phones and computers that contained evidence of the crimes under investigation, such as but not limited to, records, receipts, notes, ledgers, and other evidence reflecting names, addresses, telephone numbers, and other contact or identification data relating to co-conspirators, suppliers, or customers, or relating to the purchase, storage, use, or distribution of controlled substances or firearms.

68. Based upon my knowledge, training, and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include but are not limited to: storing names and phone numbers in electronic "address books," sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video' storing and playing back audio files' storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Based on my training and experience, I know that many cellular telephones have the capabilities described above.

69. Seizure of devices containing this information will provide information relating to co-conspirators and accomplices. I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other co-conspirators, and that they communicate both via voice calls and via email and/or text messaging. I also know that persons who sell illegal drugs and firearms regularly keep records of their illegal activities. I also know that person who sell illegal drugs regularly keep records of their illegal activities. These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled

substances preferred by or ordered by specific customers. Individuals engaged in drug trafficking often take photographs of their closest confederates. Records of drug trafficking can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone.

70. I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social networking websites, keeping their calendars, arranging for travel, storing pictures, researching topics related to drug trafficking, and accessing their bank, financial, investment, utility, and other accounts online. Additionally, many cellular phones today have a GPS navigation device on the phone. Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug and firearm traffickers meet with co-conspirators, including their sources of supply, and can aid in identifying those individuals. Additionally, review of GPS data can aid in identifying offsite locations where drug and firearm traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

71. Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone, within volatile memory, such as RAM, or on removable media, such as memory cards. I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet. This is true because:

a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one

b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

c. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

72. Law enforcement agents will endeavor to seize only the phones which, upon reasonable inspection and/or investigation conducted during the execution of the search, appear to contain the evidence in Attachment B.

73. Based on the foregoing, there is probable cause to believe that evidence of the commission of the Target Offenses, more specifically, the items set forth in Attachment B, will be found in the TARGET LOCATION, as described in Attachment A.

74. I know from my training and experience that seizure of a drug trafficker's cell phone will often provide information relating to coconspirators, accomplices, and customers. I know, based upon my training and experience, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via voice calls and via email and/or text messaging. I also know that persons who sell illegal drugs regularly keep records of their illegal

activities. These records can include, but are not limited to, contact lists of buyers and sellers, ledgers of sales and money owed by customers or to suppliers and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers. Individuals engaged in drug trafficking activities often take photographs of their closest confederates. Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular phone. From my training and experience, and information provided to be by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cell phones.

*Unlocking a Device Using Biometric Features*

75. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

76. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through their fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

77. If a device is equipped with a facial-recognition feature, as many Android, Apple, and other devices are, a user may enable the ability to unlock the device through their face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of their face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face. Similar technology allows users to unlock a device specifically through iris recognition.

78. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

79. As discussed in this affidavit, I have reason to believe that one or more digital devices will be found during the searches. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

80. I also know from my training and experience, as well as from information found in publicly available materials, including those published by device manufacturers, that biometric

features will not unlock a device in some circumstances, even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, certain Apple devices cannot be unlocked using Touch ID when a certain period of time has elapsed since the device was last unlocked and/or when the device has not been unlocked using a fingerprint and the passcode or password has not been entered in a certain period of time. Similarly, certain Android devices cannot be unlocked with Trusted Face or fingerprint access if the device has remained inactive for a certain number of hours. Other Android and Apple biometric features, and similar features from other brands, carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

81. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose biometric features are among those that will unlock the device(s), and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it may be necessary for law enforcement to have the ability to require SAEZ and MENDEZ to press their finger(s) against the sensor of the locked device(s) or place the devices in front of their faces in order to attempt to identify the device's user(s) and unlock the device(s).

82. Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned

biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of SAEZ and MENDEZ to the fingerprint scanner of the devices found at the TARGET LOCATION or; (2) hold the devices found at the TARGET LOCATION, in front of SAEZ and MENDEZ's face, and activate the facial recognition feature; and/or (3) hold the devices found at the TARGET LOCATION in front of the face of SAEZ and MENDEZ to activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to compel that SAEZ and MENDEZ state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to compel SAEZ and MENDEZ to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices. I understand that if SAEZ and MENDEZ refuse to cooperate, the matter must be resolved through contempt proceedings rather than through the application of unreasonable physical force.

83. I further request that the Court authorize law enforcement to change device settings on any seized device(s) to disable "Stolen Device Protection," which is a security measure that can be used to prevent unauthorized access to the device and data. When enabled, however, this feature might prevent forensic tools from being able to extract data from devices.

84. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

85. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

86. Accordingly, I respectfully request this Court to authorize the search of the location described in Attachment A for fruits, evidence, and instrumentalities of the Target Offenses, as described in Attachment B.

. Respectfully submitted,

______________________________________

Nicholas J. Iannone, United States Postal Inspector

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

______________________________________

HON. THOMAS O. FARRISH
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

**Property to Be Searched**

148 Ballouville Road, Dayville, Connecticut is a two-story, single-family residence. The exterior of the building is a white colored horizontal siding with white colored trim around the windows and front door. The black colored front door, facing Ballouville Road, is accessed via a two-foot-tall covered porch on the south side. The front door has six small windows on the upper portion of the door. The address number “148” is located in black numbers affixed to the right of the front door, on a structural post for the porch. Located on the parcel is a deck and above ground pool to the southwest of the residence and a garage to the north of the residence. The driveway is adjacent to the residence to the east. 148 Ballouville Road is located on the northwest corner of Ballouville Road and Clover Court. Pleasant View Drive is located approximately five parcels to the southwest. The real property is identified as 148 Ballouville Road, Dayville, Connecticut, purchased in February 2020 by Maribel SAEZ, 148 Ballouville Road, Dayville, Connecticut, identified by Assessor Parcel Number (APN) KILL-000054-000000-000079.



Views of the Target Location from Google Earth:


Clover Ct
Clover Ct
Ballouville Rd


Clover Ct
Humes Rd
Ballouville Rd
Bob's Place
Bait and Tackle
Temporarily closed
Pleasant View Dr
Ballouville Rd

# ATTACHMENT B

(Items to be Seized)

All records and tangible objects, in whatever form, that constitute evidence, fruits, or instrumentalities of Title 21, U.S.C., § 841 (distribution and possession with intent to distribute controlled substances) and Title 21, U.S.C. § 846 (conspiracy to distribute controlled substances) (collectively, the "Target Offenses"), including:

A.

1. Cellular phones used or belonging to SAEZ and MENDEZ, including but not limited to Target Telephone 1, Target Telephone 2, and the MENDEZ-7671 Phone
2. Electronic equipment, including tablets, computers, and devices that can be used to access the USPS Tracking Feature via the Internet

B. During the execution of the search of the Target Location described in Attachment A, if law enforcement personnel encounter any electronic devices that are subject to seizure pursuant to this warrant and may be unlocked using biometric features, this warrant authorizes law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of SAEZ and MENDEZ to the fingerprint scanner of the devices found at the Target Location; (2) hold the devices found at the Target Location in front of the face of SAEZ and MENDEZ and activate the facial recognition feature; and/or (3) hold the devices found at the Target Premises in front of the face of SAEZ and MENDEZ and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to place them in "airplane mode" to prevent the ability for the cellular phones to be remotely accessed and altered pending applications for search warrants for the contents of the phones. The warrant does not authorize law enforcement to compel that any person state

or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the warrant does not authorize law enforcement to compel any person to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices. This warrant does not authorize the use of unreasonable physical force to secure compliance with its authorizations.

C. Law enforcement personnel are authorized to change device settings on any seized device(s) to disable "Stolen Device Protection."